# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Bankruptcy Case No. 95-20512 |
| | § | (Chapter 11) |
| DOW CORNING CORPORATION, | § | Judge Denise Page Hood |
| | § | |
| DEBTOR. | § | **Objection Docket No. 97-0009** |

## DOW CORNING'S MOTION REQUESTING JUDICIAL ESTOPPEL OF BANKS' REVERSAL OF POSITION CONCERNING THE LOAN TERMS

Dow Corning Corporation moves to have this court apply judicial estoppel to bar creditors from deviating from unequivocal assertions of fact made by them in briefing before the Sixth Circuit concerning the loan terms. Before that court, the creditors stated that (1) there was no acceleration of default interest on unpaid principal on the loans; and (2) the default interest rate fluctuated (without any floor) at all relevant times. Creditors, in filing Amended Proofs of Claim last month, now assert facts regarding the loan terms that are diametrically opposed to their statements before the Sixth Circuit in an attempt to increase the recovery sought from Dow Corning. The doctrine of judicial estoppel precludes such tactical changes in position, made to suit whatever stage of litigation the case is in. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Great Earth Cos. v. Simons*, 288 F.3d 878, 893 (6th Cir. 2002). In support of this motion, Dow Corning incorporates its accompanying memorandum of law.

Pursuant to Local Rule 7.1, Dow Corning states that it conferred with the creditors about this motion and that the creditors did not concur in the relief sought.

WHEREAS, Dow Corning respectfully requests that the court grants its motion to apply judicial estoppel to creditors' Sixth Circuit positions regarding non-acceleration of default interest on principal and the fluctuating nature of default interest.

August 14, 2009

Respectfully submitted,

s/Timothy J. Jordan
Timothy Jordan
GARAN LUCOW MILLER, P.C.
1000 Woodbridge Street
Detroit, MI 48207
Tel: (313) 446-5531
Email: tjordan@garanlucow.com
P46098

John Donley
Sarah Donnell
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel.  (312) 862-2000

*Attorneys For Dow Corning Corporation*

2

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Bankruptcy Case No. 95-20512 |
| | § | (Chapter 11) |
| DOW CORNING CORPORATION, | § | Judge Denise Page Hood |
| | § | |
| DEBTOR. | § | **Objection Docket No. 97-0009** |

## DOW CORNING'S MEMORANDUM IN SUPPORT OF ITS MOTION REQUESTING JUDICIAL ESTOPPEL OF BANKS' <u>REVERSAL OF POSITION CONCERNING THE LOAN TERMS</u>

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    FACTS ...................................................................................................................4

       A.     What the Banks Said, Then and Now, About Acceleration......................................7

       B.     What the Banks Said, Then and Now, About Whether the Default Rate
              Floats or Is Fixed ..........................................................................................10

III.   APPLICABLE LAW .............................................................................................12

IV.    ARGUMENT:  ALL ELEMENTS OF JUDICIAL ESTOPPEL  ARE SATISFIED
       HERE ....................................................................................................................15

       A.     The Banks' New Positions On The Contracts Are Clearly Inconsistent
              With Their Prior Positions .............................................................................15

       B.     The Sixth Circuit Accepted The Banks' Positions When It Determined
              That The Plan Was Not Fair And Equitable .........................................................16

       C.     The Banks Would Derive Unfair Advantage If Permitted To Assert Their
              New Positions. ..............................................................................................18

V.     CONCLUSION......................................................................................................19

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ahrens v. Perot Sys. Corp.,*
    39 F. Supp. 2d 773 (N.D. Tex. 1999) ........................................................................ 18

*Allen v. Zurich Ins. Co.,*
    667 F.2d 1162 (4th Cir. 1982) ................................................................................... 3

*Anjelino v. N.Y. Times Co.,*
    200 F.3d 73 (3d Cir. 1999)....................................................................................... 16

*Blanton v. Inco Alloys Int'l, Inc.,*
    108 F.3d 104 (6th Cir. 1997) ................................................................................. 2, 3

*DePuy Inc. v. Biomedical Eng'g Trust,*
    216 F. Supp.2d 358 (D.N.J. 2001) ........................................................................... 16

*Edwards v. Aetna Life Ins. Co.,*
    690 F.2d 595 (6th Cir. 1982) ............................................................................. 16, 18

*Fleck v. KDI Sylvan Pools, Inc.,*
    981 F.2d 107 (3d Cir. 1992).............................................................................. 13, 14

*GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.),*
    336 B.R. 843 (S.D. Fla. 2005) ................................................................................. 15

*Great Earth Cos. v. Simons,*
    288 F.3d 878 (6th Cir. 2002) ......................................................................... v, 12, 13

*In re Coastal Plains, Inc.,*
    179 F.3d 197 (5th Cir. 1999) ................................................................................... 19

*In re Dow Corning Corp.,*
    2004 WL 764654 (E.D. Mich. Mar. 31, 2004) ........................................................... 8

*In re Dow Corning Corp.,*
    456 F.3d 668 (6th Cir. 2006) ....................................................................... 1, 9, 16, 18

*In re Dow Corning Corp.,*
    244 B.R. 678 (Bankr. E.D. Mich. 1999)..................................................................... 8

*In re Forklift LP Corp.,*
    363 B.R. 388 (Bankr. D. Del. 2007).......................................................................... 15

ii

*In re Galerie Des Monnaies of Geneva, Ltd.*,
62 B.R. 224 (S.D.N.Y. 1986) .................................................................. 13

*In re Nationwide Tower*,
362 B.R. 336 (Bankr. W.D. Ky. 2007), *rev'd on other grounds sub nom Dunlap v. Independence Bank*, Civ. A. No. 4:07-CV-00064, 2007 WL 2827649 (W.D. Ky. Sept. 28, 2007) ......................................................................................... 14

*In re Phoenix Restaurant Group, Inc.*,
373 B.R. 541 (M.D. Tenn. 2007) .......................................................... 14

*Konstantinidis v. Chen*,
626 F.2d 933 (D.C. Cir. 1980) ............................................................... 3

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ..................................................................... passim

*Pennycuff v. Fentress County Bd. of Educ.*,
404 F.3d 447 (6th Cir. 2005) ............................................................... 12

*Reynolds v. Comm'r of Internal Rev. Serv.*,
861 F.2d 469 (6th Cir. 1988) ......................................................... 15, 18

*Scarano v. Central R.R. Co. of New Jersey*,
203 F.2d 510 (3d Cir. 1953) .............................................................. 3, 19

*Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*,
911 F.2d 1214 (6th Cir. 1990) ............................................................ 2, 3

*Warda v. Comm'r of Internal Rev. Serv.*,
15 F.3d 533 (6th Cir. 1994) ............................................................... v, 13

*Williams v. Union Carbide Corp.*,
790 F.2d 552 (6th Cir. 1986) ............................................................... 19

**Statutes**

11 U.S.C. § 1129(b) ......................................................................... 2

**Rules**

FED. R. EVID. 801(d)(2) .................................................................... 19

## STATEMENT OF THE ISSUE PRESENTED

Whether creditors should be judicially estopped from changing assertions of fact made in their Sixth Circuit briefs concerning non-acceleration of default interest on unpaid principal and the fluctuating nature of default interest (without any floor) when creditors seek to assert diametrically opposed contractual interpretations before this Court that would increase the recovery sought.

K&E 15336790.10

## CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT

Application of the doctrine of judicial estoppel, and whether it is appropriate in this case, is governed by *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), *Warda v. Comm'r of Internal Rev. Serv.*, 15 F.3d 533, 538 (6th Cir. 1994), and *Great Earth Cos. v. Simons*, 288 F.3d 878, 893 (6th Cir. 2002), among other cases.

v

# I.   INTRODUCTION

As the result of recent court-ordered negotiations, all Class 4 excess interest claims have now been settled, with the exception of six claims based on floating-rate bank loan agreements. Two aspects of the bank loans are at issue in these remand proceedings: (1) what are the key contract terms and the interest numbers that flow from them; and (2) whether equitable factors override the banks' claimed entitlement to default-rate interest.

The second part of the inquiry, concerning equitable factors, is an important focus of these remand proceedings. *See In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006) (remanding "for proceedings consistent with this decision, including the consideration of any equitable factors affecting the interest rate"). The relevant equitable factors – for example, whether and to what extent the banks incurred any materially increased risks of non-payment during Dow Corning's bankruptcy case – are hotly disputed and fact-intensive. But the first part of the remand inquiry – determination of the contract terms and associated interest computations – should be simple and straightforward because the terms of the loan agreements are clear. Indeed, in prior briefing before this Court and the Sixth Circuit, the banks unequivocally agreed to what those terms mean.

But while the contract terms ***should be*** simple and straightforward, they no longer are. On July 27, 2009, the banks filed Amended Proofs of Claim in which they now assert that two critical provisions of the loan agreements ***mean the exact opposite*** of what the banks had maintained in previous filings with this Court and the Sixth Circuit. The banks' earlier court statements were made during phases of this case when it was tactically advantageous for the banks to assert moderate positions so as not to appear overreaching. Having prevailed with this

1

approach in the Sixth Circuit, the banks now seek to reverse their positions, urging aggressive new "factual" positions that would enable them to recover more than $50 million of additional default interest beyond what they have asked for previously.

The doctrine of judicial estoppel bars litigants from making such unprincipled and cynical shifts in position. As the United States Supreme Court stated in *New Hampshire v. Maine*:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

532 U.S. 742, 749 (2001) (internal quotation marks and citations omitted). Judicial estoppel "is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne Indus., Inc. v. Nat'l Labor Relations Bd.*, 911 F.2d 1214, 1218-19 (6th Cir. 1990). It "prevent[s] the system from being manipulated by chameleonic litigants." *Blanton v. Inco Alloys Int'l, Inc.*, 108 F.3d 104, 108 (6th Cir. 1997) (internal quotations and citations omitted).

When they appeared before the Sixth Circuit, the banks' objective was to persuade the appellate court that Dow Corning's Plan of Reorganization was not "fair and equitable" to those creditors, *see* 11 U.S.C. § 1129(b), because it did not provide for interest payable in accordance with the terms of their loan agreements, as described by the banks. To that end, the banks made a point of telling the Sixth Circuit that they were forgoing more aggressive positions that they

2

*could have* asserted concerning the contract terms, in favor of more modest positions, and that the contract terms as characterized in the banks' Sixth Circuit briefing made the Plan fair and equitable and confirmable as to them. (*See* Section II-A, below) The banks' approach succeeded in the Sixth Circuit, convincing the court to rule in their favor that the Plan of Reorganization, as to them, included the terms they set forth. But the banks now seek to disavow the contract interpretations that they used to persuade the Sixth Circuit, and to replace them with new interpretations that, if accepted, would enhance the banks' interest claim by tens of millions of dollars. This is precisely the type of "cynical gamesmanship," *Teledyne*, 911 F.2d at 1218, manipulation by "chameleonic litigants," *Blanton*, 108 F.3d at 108, "blowing hot and cold as the occasion demands," *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1167 n.3 (4th Cir. 1982) and "playing fast and loose with the courts," *Scarano v. Central R.R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953), that the Sixth Circuit and other courts have barred on judicial estoppel grounds. Accordingly, the banks should be judicially estopped from making assertions of fact on remand that are flatly inconsistent with assertions they made before the Sixth Circuit.

Such an order would also promote efficiency, a corollary objective (in addition to protecting judicial integrity) of judicial estoppel.[1] The parties are about to embark on extensive discovery, fact-finding, hiring of experts and cross-examination of the other side's experts. It would be a huge waste of the parties' time to have to develop multiple models and interest calculations, based on the banks' belated and self-serving attempt to rewrite the key loan terms. A judicial estoppel order entered now would save a great deal of time and expense.

---

[1]    *See Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980) (object of judicial estoppel "is to safeguard the administration of justice by placing a restraint upon the tendency to reckless and false swearing and thereby preserve the public confidence in the purity and efficiency of judicial proceedings").

3

## II. FACTS

The six loans at issue are a revolving credit facility (or "revolver")[2] from which Dow

Corning borrowed $375 million and five term loans under which Dow Corning borrowed a total

of $82 million from various banks. The loans had generally similar terms, including three

interest rates that could potentially apply depending on the situation: (1) the lowest rate at all

times, and the rate that Dow Corning always elected, known as the "Eurodollar Rate" (LIBOR +

1%); (2) the "Corporate Base," "Base" or U.S. Prime Rate, which was generally 2% higher than

the Eurodollar Rate, and for that reason was never elected by Dow Corning; and (3) an enhanced

default rate (typically Prime Rate + 1%) that applied if certain events of default and other

conditions specified in the loan agreements occurred. The rates all fluctuated according to

publicly available rate information.

If the banks had received the contractual, market-based Eurodollar Rate throughout the

pendency of the Dow Corning chapter 11 case – in other words, the benefit of their bargain –

they would have received about $291 million of interest. As it turned out, *they received $47*

*million more than that* when, upon Dow Corning's emergence from bankruptcy on June 1,

2004, the banks were paid $338.7 million of pendency interest ($277.7 million for the revolver

and $61.0 million for the bank term loans) calculated at the 6.28% Case Interest rate applicable

to all Class 4 unsecured creditors under Dow Corning's Plan of Reorganization ("Plan"). (*See*

Ex. 2, Chart comparing excess payments using 6.28% Case Interest rate compared to floating

Eurodollar Rate) At emergence, the banks also received payment in full of their principal,

approximately $460 million for all the loans. The current dispute thus is about whether the

---

2   Consisting of a consortium of 16 banks, including administrative agent Bank of America.

4

banks, having already been made whole and having further received $47 million of surplus interest at emergence, should now get ***additional*** pendency interest in the amount of the difference between an even higher default-rate interest calculation and the $338.7 million in interest previously paid.

When the banks appealed this Court's denial of enhanced, default-rate interest to the Sixth Circuit, the total additional interest they claimed was approximately $150 million as of the June 1, 2004 Effective Date (over and above the $338.7 million previously paid). But now, in Amended Proofs of Claim filed by the banks on July 27, 2009, the banks have reversed their position on the meaning of two key contract provisions, thereby increasing their claim for additional interest to approximately $190 million (in 2004 dollars, corresponding to $245 million today)[3], an increase of approximately $40 million (in 2004 dollars, or $52 million today).

The two key loan terms on which the banks have now flipped are: (1) "acceleration" – that is, whether elevated, default-rate interest begins to be paid on unpaid principal at an earlier, accelerated date (the filing of Dow Corning's chapter 11 petition in 1995), rather than at the loan's maturity date (in 1997 for most loans), and (2) whether the default rate of interest fluctuates at all times, as opposed to having a fixed rate "floor."[4] The loan agreements' plain language sets out these contractual provisions clearly. Based upon those clear provisions, the

---

[3] The Plan provides that, to the extent any additional pendency interest is determined to be owed as of the June 1, 2004 Effective Date, creditors are entitled to post-emergence "Plan Interest" on that amount, at the rate of 5% compounded semi-annually. This computes to 29.09% for the period of June 1, 2004 through July 31, 2009.

[4] There may also have been shifts of position concerning other terms, such as compound interest (whether it compounds, and how often) and whether Dow Corning's chapter 11 filing constituted an event of default. These issues are not the subject of this motion, either because the banks appear to have reverted to their original position (compound interest) or because the treatment of the issue appears to be subsumed within the treatment of another issue already addressed by this motion (acceleration).

5

banks admitted before the Sixth Circuit that: (1) unpaid principal did not accelerate from the loans' maturity date to some earlier date; and (2) the default interest rate floated at all relevant times in correlation with market fluctuations in the Prime Rate. The banks told the Sixth Circuit that these and other contract terms were "undisputed" and assured the Sixth Circuit that the banks were seeking only what they were entitled to: "[t]hroughout these proceedings commercial creditors have sought only to recover the entitlements owed to them in the undisputed contracts underlying their claims." (Ex. 4, App. Opening Br. p. 29)

Now, the banks have abandoned these once-"undisputed" contractual meanings in favor of new, more lucrative meanings. They seek acceleration of default interest on unpaid principal – a switch that, if accepted, would provide approximately $19.8 million more interest to the banks (as of the Plan's June 1, 2004 Effective Date; or about $25.6 million today with 5% interest per annum added since 2004). Likewise, they now assert that the default rate fluctuates only some of the time – when rates run high – but becomes fixed at an interest rate floor whenever fluctuating market rates drop below that floor. As discussed in Section II-B below, the banks' Amended Proofs of Claim are unclear about whether the interest rate for the floor they are seeking is 8.125% or 6.28%: in the text of most of the Amended POCs, they say that the default rate cannot be "less than 1% over the rate" in effect immediately prior to the May 15, 1995 "Petition Date" (when Dow Corning filed its chapter 11 petition), which would correspond to an 8.125% rate (1% over the Eurodollar Rate of 7.125% that was in effect on May 12, 1995); however, in a footnote, the Amended POC's refer to a 6.28% minimum on the default rate in the

6

event the Court considers the equities in this case.[5]  (*See* Ex. 7, JP Morgan Am. POC at ¶ 5a)
There is no contractual or legal basis for either the 8.125% or the 6.28% number, or indeed for
any other number constituting a floor.  The banks' newly-asserted position regarding a fixed
floor for the default interest rate, if accepted, would yield about $21.2 million of additional
interest for the banks, assuming conservatively that the lower, 6.28% floor applies (as of the
2004 Effective Date; corresponds to roughly $27.4 million today).  In sum, the two new
contractual interpretations urged by the banks would bring them at least $52 million, in today's
dollars, over and above what they told the Sixth Circuit they were fairly entitled to.

### A.    What the Banks Said, Then and Now, About Acceleration

The bank loans all had defined durations, concluding on a maturity date when principal
was to be repaid.  On the revolver, for example, $375 million was drawn down by Dow Corning,
and the maturity date was October 31, 1997.  If an event of default occurred during the term of
the loan, such as a failure to make a legally required interest payment, the loan agreements were
very clear that default-rate interest was only owed with regard to overdue installments of
*interest*, not with regard to unpaid *principal*.[6]  Payment of elevated, default-rate interest on the

---

[5]  The 6.28% rate was the Case Interest rate in Dow Corning's Plan, which creditors opposed.  In fact, at
emergence they were paid $47 million more interest, at the 6.28% Case Interest rate, than their contracts would
have provided at non-default rates.  The Case Interest rate of 6.28% has no further applicability to this dispute,
and no explanation or basis is given as to why creditors now propose that notwithstanding they have already
been paid a rate of 6.28% on the debt, they are entitled to pick and choose between contract rates (which they
have insisted must apply) and the Plan-based Case Interest rate at any point in time when the Plan-based rate
exceeds the default contract rate.

[6]  Prior to maturity, the highest rate that generally could apply to the principal in the event of a default was the
Base or Prime Rate, which was intermediate between the Eurodollar Rate and the default rate (and even the
applicability of this Base/Prime Rate is disputed).  To become entitled to heightened default rate interest on
principal on an accelerated basis prior to the loan maturity date, at a minimum the banks would have had to
satisfy very specific notice provisions (*see, e.g.*, BNY Agmt. § 6.1 & Ex. 8, B of A Revolver § 8.02), which
they did not do here.

K&E 15336790.10

95-20512-dph    Doc 30055    Filed 08/14/09    Entered 08/14/09 17:10:28    Page 15 of 28

principal was not accelerated to the date of the default, and as a result default interest on unpaid

principal could begin (if at all) only after the loan's maturity date passed, several years later.

The banks conceded this fact unequivocally and repeatedly before the Sixth Circuit,

stating:

- "[T]he contractual default interest rate applied to overdue installments of interest until *the principal amount matured in 1997*. *Thereafter*, under the contract, the *default rate applied to* both *principal* and interest." (Ex. 4, App. Opening Br. p. 27, emphasis added)

- "Appellants seek the applicable *default rate from the date of natural maturity* of the agreement." (Ex. 5, App. Reply Brief p. 16, n.5, emphasis added)

- "For example, under the Bank of America agreement, if a scheduled payment of interest becomes overdue, interest accrues on the unpaid interest at prime plus one percent compounded quarterly. *If the principal of the debt matures* (as the Bank of America facility did in 1997 pursuant to its original terms), *interest accrues at Prime plus one percent on the principal* amount as well." (Ex. 5, App. Reply Br. p. 42, n.17, emphasis added)

When they appeared before the Sixth Circuit, the banks declined to assert that the loan

agreements call for acceleration of default interest from the loans' maturity dates to an earlier

date such as the May 15, 1995 Petition Date, stating:

> Appellants recognize that they could press the argument that by
> operation of law, the entire amount of the outstanding principal
> was accelerated on the Petition Date and that the default rates
> should apply to that entire amount from the Petition Date forward.
> (Ex. 5, App. Reply Br. p. 27)[7]

---

[7] The creditors also cannot accelerate payment of default interest to the Petition Date because of the prior rulings regarding the "*ipso facto*" doctrine, which are law of the case. Briefly, the *ipso facto* doctrine says that contract provisions that purport to make the mere fact that a debtor filed for bankruptcy an event of default are unenforceable. In his 1999 opinion on whether the treatment of Class 4 was fair and equitable, Judge Spector ruled that "No effect is to be given to contractual provisions which purport to define as a default the filing of a voluntary petition for bankruptcy relief." *In re Dow Corning Corp.*, 244 B.R. 678, 696 (Bankr. E.D. Mich. 1999). *See also In re Dow Corning Corp.*, 2004 WL 764654, at *11 (E.D. Mich. Mar. 31, 2004) ("Clauses in an executory contract that result in a breach of the contract solely due to the bankruptcy filing of a party are considered 'ipso facto' classes which are unenforceable under the Bankruptcy Code."). Judge Spector's ruling was not appealed and is law of the case.

8

But the loan terms and facts of this case do not support acceleration. Accordingly, and no doubt

to demonstrate their reasonableness at a time when the Sixth Circuit was weighing what terms

were necessary to make the Plan "fair and equitable" in regards to interest owed to the banks, *see*

*generally In re Dow Corning Corp.*, 456 F.3d at 677-80, the banks emphasized that they were

refraining from asserting acceleration:

> [A]s Appellants indicated to the District Court below and in their
> opening brief, they do not seek default rates of interest on the
> entire amount of principal from the Petition Date by operation of
> law, but rather ***seek default rates in accordance with the terms of
> the parties' contracts*** – that is, default rates on interest not paid on
> specified payment dates and ***on principal from the date of natural
> maturity of the relevant agreements***.

(Ex. 5, App. Reply Br. p. 27-28, emphasis added; *see also* Ex. 4, App. Opening Br. p. 32, n.17)

Thus, the banks clearly represented to the Sixth Circuit that they only sought default interest on

the outstanding principal after the date of loan maturity, not from an accelerated, earlier date.

The banks have now flipped and contend that default-rate interest on principal accelerates

from the 1997 maturity date to the Petition Date of May 15, 1995. For example, in its recent

Amended Proof of Claim, JP Morgan Chase Bank asserted that under the contract they are

entitled to:

> interest on all obligations of Dow [Corning] under the Loan
> Documents calculated at the floating ***default rate of interest*** under
> the Loan Agreement (being the Corporate Base Rate, as that term
> [is] defined in the Loan Agreement, plus 1.0% per annum, but not
> less than 1% over the rate required to be paid on the loan
> immediately prior to the Petition Date), ***commencing on the
> Petition Date and continuing through the Effective Date of the
> Plan*** . . . .

(Ex. 7, JP Morgan Chase Am. POC dated July 24, 2009, ¶ 5a)

**B.    What the Banks Said, Then and Now, About Whether the Default Rate Floats or Is Fixed**

The loan agreements clearly provide that default-rate interest floats.  For example, the revolver states that if any amount of principal is not paid in full at the maturity date, Dow Corning "agrees to pay interest on such unpaid principal . . . at a *fluctuating rate per annum equal to the Base Rate plus 1%*."  (Ex. 8, § 2.08(c) (emphasis added))

Before the Sixth Circuit, the banks characterized the loan agreements in accordance with their plain language, admitting that default-rate interest floats:

- "[I]n the event of a default, the *floating* Prime-based rate (plus the applicable margin of typically 1%) applied." (Ex. 4, App. Opening Br. p. 25, emphasis added)

- "[T]he default interest rate is tied to Prime, which *has varied over time in accordance with market fluctuations*." (Ex. 5, App. Reply Br. p. 16 n.5, emphasis added)

Now, in an about-face, the banks assert in their Amended Proofs of Claim that the default rate (Prime Rate + 1%) only floats when rates are high; when rates drop below a certain level, the banks contend that a fixed "floor" kicks in.  As noted earlier, there is some confusion in the Amended Proofs of Claim whether the proposed floor is at an 8.125% interest rate or at a 6.28% interest rate.  In the text of the Amended Proofs of Claim for the term loans, the banks state that the default rate floats at Prime + 1%, "but not less than 1% over the rate required to be paid on the loan immediately prior to the Petition Date." (*See* Ex. 7, JP Morgan Chase Am. POC ¶ 5a) Since the Eurodollar Rate was 7.125% on May 12, 1995,[8] the last business day before the Petition Date, 1% over the rate on that date would be 8.125%.  This suggests that the banks are

---

[8]    The Eurodollar Rate of 7.125% applicable to most loans on that day consisted of the London Interbank (LIBOR) loan rate of 6.125%, plus a 1% adder.

10

seeking to modify the default rate so that it fluctuates only when rates exceed 8.125%, but stops fluctuating and stays at a fixed floor of 8.125% whenever the published rate drops below that level. However, in footnote 1 of all the Amended Proofs of Claim, the banks state that "[s]hould the Court consider the equities of the case," then interest "should be calculated in such a manner that the default rate under the Loan Agreement does not at any time float below the Plan Rate of 6.28% per annum." (Exs. 7, 8) So the proposed floor may instead be 6.28%.

Whatever number the banks actually are seeking, their contention that the default interest rate has a fixed floor below which it cannot float is unsupportable on several levels. *First*, it has no basis whatsoever in the loan agreements – a point that the banks readily conceded before the Sixth Circuit, when they stated that the default rate fluctuates at all times. *Second*, creditors are not entitled to pick and choose between contractually-based floating default rates and non-contractual, fixed rates (one of which, the 6.28% rate, is derived from Plan terms that they vigorously and successfully opposed in court) – based on nothing more than which rate pays the banks more money on any given day. Neither the Bankruptcy Code nor any other law authorizes creditors to exercise unilaterally this "have your cake and eat it too" option. *Third*, this approach is inconsistent with the purely contract-based approach the creditors asserted before the Sixth Circuit. There, the banks represented that (a) only following the loan contracts' terms could render the Plan fair and equitable under the Bankruptcy Code, (b) those contract terms called for floating default-rate interest (Prime +1%) to begin at loan maturity, without acceleration and without any fixed-rate floor, and (c) any variation from those terms, such as those taken by the Bankruptcy Court and District Court below, is unfair and inequitable. For the banks to advocate

11

such a self-serving and legally unsupportable new interpretation of the contract terms at this late stage is impermissible.

## III.  APPLICABLE LAW

Judicial estoppel is merited where three basic elements are met:  (1) "a party's later position must be clearly inconsistent with its earlier position," (2) "the party has succeeded in persuading a court to accept that party's earlier position," and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (also stating that judicial estoppel is "probably not reducible to any general formulation or principle"). *See also Pennycuff v. Fentress County Bd. of Educ.*, 404 F.3d 447, 452-53 (6th Cir. 2005) (citing *New Hampshire*'s three-factor test).

Courts have invoked judicial estoppel in a wide variety of contexts to estop a party from changing its previously asserted position to gain an unfair advantage at a later stage of litigation. The Sixth Circuit in *Great Earth Cos. v. Simons*, 288 F.3d 878, 893 (6th Cir. 2002), applied judicial estoppel to prevent a party, in a maneuver analogous to the banks' efforts to change the meaning of the contracts here, from asserting inconsistent interpretations of a franchise agreement. Initially, the *Great Earth* plaintiffs successfully opposed a petition to compel arbitration in the Southern District of New York by arguing that the defendant could only enforce an arbitration/litigation provision of the franchise agreement in Michigan. *Id.* In contrast, before the Sixth Circuit, plaintiffs argued that the franchise agreement required defendant to bring any dispute in the Southern District of New York. *Id.* The Sixth Circuit held that plaintiffs were judicially estopped from advancing these inconsistent positions. "To hold

otherwise would allow the [plaintiffs] to defend diametrically opposed interpretations of the Agreement – one that requires litigation in New York and one that prohibits litigation there." *Id.*

In *Warda v. Commissioner of Internal Revenue Service*, 15 F.3d 533 (6th Cir. 1994), the Sixth Circuit applied judicial estoppel when a taxpayer shifted positions to suit her financial benefit. The taxpayer first claimed in a probate proceeding that she held title to certain parcels of land. Years later, when the IRS sought to impose a gift tax on the taxpayer for her transfer of these properties to her son, the taxpayer claimed that title rested with her son. *Id.* at 538. The Sixth Circuit applied judicial estoppel, reasoning that "[s]he inherited substantial wealth many years ago" based on one position and "cannot prevail again" by arguing the opposite in order to avoid imposition of the gift tax. *Id.* at 539.

Judicial estoppel also has been widely invoked in bankruptcy proceedings to preclude parties from conceding a particular legal right or claim valuation at one stage, only to change course and pursue that claim or a higher valuation at a later stage. For example, in *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir. 1992), the plaintiffs convinced the bankruptcy court to lift the automatic stay in order to proceed with their tort suit, representing that any judgment against the debtor would be limited to the insurance recovery. After the stay was lifted, however, the plaintiffs obtained a jury verdict in excess of the insurance recovery, and sought to retain the excess. The Third Circuit applied judicial estoppel to bar this change in position. *Id.* at 122. In *In re Galerie Des Monnaies of Geneva, Ltd.*, 62 B.R. 224 (S.D.N.Y. 1986), the debtor asserted that it knew of no preferential transfers, which led the bankruptcy court to approve a reorganization plan allowing the debtor to retain the benefit of any recouped preferential transfers. The day after the plan was approved, the debtor filed an adversary action

13

to recover preferential transfers. The bankruptcy court applied judicial estoppel to bar this subsequent change of position, and the district court affirmed. *Id.* at 226. In *In re Phoenix Restaurant Group, Inc.*, 373 B.R. 541, 551-52 (M.D. Tenn. 2007), a creditor asserted that it had a valid reclamation claim against a bankrupt's estate. Based upon that assertion, the trustee authorized certain payments. Later in the bankruptcy proceeding, the creditor asserted a new value defense and argued that it had not possessed a valid reclamation claim. The bankruptcy court judicially estopped the creditor from changing assertions, because allowing the creditor to "adopt a wholly different position" would give the creditor "a second recovery of the same value," and the district court affirmed. *Id.* at 552.

In a case before this Court, *In re A.P. Liquidating Co.*, 350 B.R. 752, 754 (E.D. Mich. 2006) (Hood, J.), a creditor filed a proof of claim, to which the debtor objected and reserved the right to bring particular causes of action against the creditor. The creditor subsequently was allowed to withdraw its proof of claim. The debtor then filed a complaint against the creditor in the bankruptcy court. *Id.* After lengthy proceedings, in which the complaint was dismissed by the bankruptcy court and reinstated by the district court, the parties disputed whether the debtor had a right to a jury trial, an issue that turned on whether the complaint was integrally related to the claim objections process. This Court affirmed the bankruptcy court's decision that judicial estoppel applied: "Plaintiffs argued on [the first] appeal that the claims were a part of the Objection to Claims process and cannot now argue to the contrary. As such there is no right to a jury trial as Plaintiff's claims are part of the claims resolution process." *Id.* at 757.[9]

---

[9]  *See also In re Nationwide Tower*, 362 B.R. 336 (Bankr. W.D. Ky. 2007), *rev'd on other grounds sub nom Dunlap v. Indep. Bank*, Civ. A. No. 4:07-CV-00064, 2007 WL 2827649 (W.D. Ky. Sept. 28, 2007) (ten months after entry of agreed order in which estate abandoned its interest in note, based on trustee's representation to

14

## IV.  ARGUMENT:  ALL ELEMENTS OF JUDICIAL ESTOPPEL ARE SATISFIED HERE

Where, as here, a party has made factual assertions at one stage of a legal proceeding, the

party is judicially estopped from taking inconsistent positions at a later stage of the proceeding.

Each of the judicial estoppel factors is satisfied here:  (1) the banks seek to assert positions that

are clearly inconsistent with positions taken before the Sixth Circuit; (2) the Sixth Circuit

accepted the banks' initial positions when it found in their favor; and (3) the banks would derive

unfair advantage from their new positions because, having convinced the Sixth Circuit to remand

based on the banks' characterization of contract terms, the banks now seek to swap in new

contract meanings in order to increase their recovery by tens of millions of dollars.  Judicial

estoppel bars such a cynical change in position.

### A.  The Banks' New Positions On The Contracts Are Clearly Inconsistent With Their Prior Positions

As discussed above, the banks filed briefs in the Sixth Circuit (and in this Court), setting

forth their unequivocal positions that:  (1) the loan agreements did not provide for acceleration of

default interest on unpaid principal from the date of natural maturity to some earlier date; and (2)

the default interest rate floats in accordance with the market-based Prime rate.[10]  In their

---

court that a bank held a perfected security interest in the note, trustee was judicially estopped from arguing that the bank did not have a perfected security interest); *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 861-64 (S.D. Fla. 2005) (*citing Reynolds v. Comm'r of Internal Rev. Serv.*, 861 F.2d 469 (6th Cir. 1988) (finding judicial estoppel where a party entered into a stipulation, the bankruptcy court relied on the stipulation in approving a joint motion, and the party later argued the stipulation was not enforceable); *In re Forklift LP Corp.*, 363 B.R. 388, 396 (Bankr. D. Del. 2007) (applying judicial estoppel where a party took a position in support of plan confirmation, then took an inconsistent position after the plan was confirmed).

[10]  The banks may contend that the judicial admissions made before the Sixth Circuit were those of the Official Committee of Unsecured Creditors (represented by Davis Polk) and that they should not now be bound by those statements.  Any such argument should be rejected, because the banks were parties to those briefs and signed those briefs through their counsel, including Mr. Hertzberg and Mr. Rosenberg.

K&E 15336790.10

Amended Proofs of Claim, the banks have abandoned these positions. The banks now assert that: (1) default interest applies to principal on an accelerated basis, beginning on the Petition Date; and (2) the default interest rate floats only when interest rates exceed 8.125% (or possibly 6.28%, as discussed above), but has a fixed floor whenever the default rate drops below that percent. These positions are flatly inconsistent with the banks' earlier assertions.

Moreover, the banks' switch in positions is calculated and tactical, shifting depending on what position is most advantageous at each successive stage of the case. The essential function of judicial estoppel is to prevent precisely this type of "intentional inconsistency." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982).[11]

### B. The Sixth Circuit Accepted The Banks' Positions When It Determined That The Plan Was Not Fair And Equitable

In their appeal, the banks challenged Judge Spector's approval, and this Court's affirmance, of Dow Corning's Plan of Reorganization, which provided pendency interest rates that were lower than the default rate. *See generally* 456 F.3d at 671, 673-74. The appeal made two main arguments, only one of which was accepted. First, the banks argued that Judge Spector had erred when he interpreted the Plan language as providing for pendency interest at the non-default contract rate. This argument failed when the Sixth Circuit found that Judge Spector's interpretation of the relevant Plan language, while incorrect in their view, was not an abuse of discretion. *Id.* at 677. Second, the banks argued that the Plan's denial of default-rate interest

---

11    Calculated tactical shifts, like those undertaken here, are disfavored. *See, e.g., Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 100 (3d Cir. 1999) (applying judicial estoppel where a party made a "tactical" decision to forgo discovery in order to advance the case, then on appeal argued that denial of discovery was error); *DePuy Inc. v. Biomedical Eng'g Trust*, 216 F. Supp. 2d 358, 370-77 (D.N.J. 2001) (applying judicial estoppel where a party made the "tactical" decision to waive the right to a *Daubert* hearing and then, on appeal, argued failure to hold a *Daubert* hearing was error).

K&E 15336790.10

violated the "fair and equitable" rule of Section 1129(b) of the Bankruptcy Code. This argument succeeded, as the Sixth Circuit accepted the banks' contract-based arguments.

The banks articulated their "fair and equitable" argument before the Sixth Circuit as follows: "Whether a solvent debtor's plan of reorganization satisfies Section 1129(b) of the Bankruptcy Code [the "fair and equitable" test] where the plan provides for the debtor's equity holders to retain billions of dollars of equity and for its commercial creditors, who rejected the plan, to receive less than their full contractual entitlements, *including interest in accordance with the terms of the contracts*." (Ex. 4, App. Opening Br. p. 4-5, emphasis added) The banks contended that the Plan was not fair and equitable because "[u]nder the terms of the relevant contracts, the amount of interest payable to Class 4 during the nine years of the bankruptcy case ('pendency interest') is approximately $150 million more than [Dow Corning's position as to what it] should have to pay." (Ex. 5, App. Reply Br. p. 9-10; *see also* Ex. 4, App. Opening Br. p. 7) The banks arrived at these figures by citing to the contracts' plain terms – including the no-acceleration and fluctuating default rate provisions, both of which they unequivocally accepted.[12]

The Sixth Circuit adopted the banks' argument that the Plan was not fair and equitable:

> Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract. To do otherwise (i.e., to interpret the amended plan as not requiring the

---

[12] Specifically, the banks conceded that the loan agreements "contain[ed] default interest provisions requiring interest to accrue on overdue amounts of principal and interest at Prime plus, typically 1%," with no indication of a floor; and "each of the relevant debt obligations at issue matured by its own terms during the pendency of the bankruptcy case," with no indication that acceleration was being sought. (Ex. 5, App. Reply Br. p. 9) Further, the banks expressly stated that their calculation was based upon "applying the contractual default rate only after natural maturity." (Ex. 4, App. Opening Br. p. 21 n.11) In short, the banks never argued that acceleration applied, or that the default rate should be anything other than floating.

payment of default interest), they argue, would violate § 1129(b)'s
fair and equitable standard. **We agree.**

456 F.3d at 679 (emphasis added). Thus, because the Sixth Circuit adopted the banks' fair and

equitable argument, of which the contract terms were an essential part, the banks "succeeded in

persuading [the Sixth Circuit] to accept [their] earlier position," and the second factor of the

judicial estoppel doctrine has been met. *See New Hampshire*, 532 U.S. at 750.[13]

### C. The Banks Would Derive Unfair Advantage If Permitted To Assert Their New Positions.

The banks now seek to abandon their contract-based positions in favor of bold new

positions that would pay them interest far in excess of what they told the Sixth Circuit would be

fair and equitable. No longer feeling constrained by the contracts' plain terms, the banks assert

new positions seeking acceleration of default interest and the imposition of a floor on the

fluctuating default interest rate, solely to maximize their recovery. The banks' position on

acceleration, if accepted, would enhance their recovery by approximately $19.8 million as of

June 1, 2004 (about $25.6 million in today's dollars). The banks' position imposing a floor on

default interest would boost their claim by approximately $21.2 million in June 2004 dollars (or

about $27.4 million today).[14] The reason a floor benefits the banks is because interest rates

dropped in the later years of Dow Corning's chapter 11 case, with the floating Prime-based

---

[13] In order to show that the court accepted the party's prior position, it need not be shown that the party "prevailed on the merits," *see Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988), although the banks, in fact, did prevail on the merits of their fair and equitable argument before the Sixth Circuit. Instead, this factor is met when "the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Id.* (internal quotation marks and citation omitted). *See also Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 n.5 (6th Cir. 1982); *Ahrens v. Perot Sys. Corp.*, 39 F. Supp. 2d 773, 778-79 (N.D. Tex. 1999) (finding judicial acceptance where a party made statements supporting a motion to remand, and the court remanded).

[14] Using the 6.28% number for the floor; the impact would be even higher if the 8.125% figure were used.

18

default rate dropping as low as 4% in 2003 and 2004. (*See* Ex. 3, charts showing financial impact of new positions)

The banks' switch in position is a classic example of intentional inconsistency, and taking unfair advantage, that the doctrine of judicial estoppel is designed to preclude. *See New Hampshire*, 532 U.S. at 751 (judicial estoppel forbids the use of "intentional self-contradiction . . . as a means of obtaining unfair advantage") (internal quotations and citations omitted). *See also In re Coastal Plains, Inc.*, 179 F.3d 197, 206 (5th Cir. 1999) (*quoting Scarano*, 203 F.2d at 513) ("The doctrine is generally applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'").

## V. CONCLUSION

There is no question that the banks' assertions in prior Sixth Circuit briefing are not only admissible before this Court as evidentiary admissions, *see Williams v. Union Carbide Corp.*, 790 F.2d 552, 555-56 (6th Cir. 1986); FED. R. EVID. 801(d)(2), but are highly probative and persuasive regarding what the interest terms of the loan agreements in fact mean. But that is not a sufficient remedy. Dow Corning should not be put to the burden and expense of dealing with the banks' new, reinvented contract interpretations during the extensive discovery and expert preparation work about to begin. In Dow Corning's view, the contract terms are clear and should be the subject of a stipulation among the parties. Based on the representations the banks made before the Sixth Circuit, Dow Corning would have thought that the banks would agree. But they have chosen to stake out a different path.

The benefit, if the Court enters an order now judicially estopping the banks from changing their previous positions on acceleration and floating default interest, is that these

19

remand proceedings will move forward more efficiently. The parties would be operating under the same understanding of what the contracts say. The basic calculations and numbers would be set. It's true that the impact of various equitable factors on these numbers would still be debated. But instead of having to consider the effect of equitable factors on multiple contract scenarios, the parties, their experts and the Court would need only to consider the effect of equitable factors on a single, agreed scenario. A significant amount of unnecessary work will be avoided.

Accordingly, Dow Corning asks the Court to enter an order judicially estopping creditors from changing the assertions made in their Sixth Circuit briefing concerning non-acceleration of default interest on unpaid principal and the fluctuating nature of default interest (without any floor).

August 14, 2009

Respectfully submitted,

s/Timothy J. Jordan
Timothy Jordan
GARAN LUCOW MILLER, P.C.
1000 Woodbridge Street
Detroit, MI 48207
Tel: (313) 446-5531
Email: tjordan@garanlucow.com
P46098

John Donley
Sarah Donnell
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel. (312) 862-2000

*Attorneys For Dow Corning Corporation*

20