# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:

**DOW CORNING CORPORATION,**

      **Debtor.**                                     **Bankruptcy Case No. 95-20512**
_____      **Chapter 11**

      **London Market Insurers Matters.**           **HON. DENISE PAGE HOOD**
_____/

## MEMORANDUM OPINION AND ORDER
## REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT
## FILED BY THE LONDON MARKET INSURER CLAIMANTS

## I. BACKGROUND

This matter is before the Court on three Motions for Partial Summary Judgment filed by Certain London Market Insurance Companies ("London Market Insurers"): 1) Motion for Partial Summary Judgment Regarding "Actual Assumed" Language (#29941, filed 7/31/08); 2) Motion for Partial Summary Judgment to Preclude Proposed Reinsurance Set-Off Defense (#29965, filed 10/24/08); and, 3) Motion for Partial Summary Judgment to Preclude Dow Corning's Defense that the Reimbursement is Unenforceable (#29996, filed 3/27/09). Response and reply briefs have been filed on all three motions and a hearing held on all of the motions.

Thirty (30) Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies filed an Application for Allowance and Payment of its Administrative Expense Claim filed with the Court on August 12, 2004 under § 503(B) of the Bankruptcy Code, 11 U.S.C. § 503(b), in an amount not less than $91.2 million dollars, plus interest. Each London Market Insurer

Claimant seeks partial reimbursement under a "clawback" provision in the 1995 Settlement Agreement with Dow Corning Corporation ("Dow Corning") in settlement payments that they made to resolve Dow Corning's insurance coverage claims for breast implant liabilities. Dow Corning filed an Objection to the Application and a Motion to Dismiss on August 17, 2005 claiming that the Application was not ripe for judicial determination and failed to state a claim upon which relief can be granted. The Court denied the motion in an Order dated June 18, 2007.

On June 27, 2007, the London Market Insurers filed an Amended Application. Dow Corning filed its Objection to the Amended Application on August 7, 2007. The parties are currently conducting discovery on the matter and have filed various discovery motions, along with the partial summary motions at issue in this opinion.

## II.    SETTLEMENT AGREEMENT HISTORY

The London Market Insurers and Dow Corning entered into various contracts of insurance covering certain Dow Corning liability claims. The parties disagreed with respect to the coverage of certain claims, including breast implant, environmental pollution and other liability claims. In 1993, a lawsuit was filed before the Wayne County Circuit Court, State of Michigan, *Dow Corning Corporation, et al. v. Granite State Ins. Co., et al.,* Case No. 93-325788, involving the parties' rights under the various liability insurance contracts.

On May 15, 1995, Dow Corning filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code because of Dow Corning's potential liability from the numerous breast implant claims filed against Dow Corning. The parties thereafter agreed to compromise the litigation before the Wayne County Circuit Court. The terms of the compromise are set forth in an October 27, 1995 Settlement Agreement Between Dow Corning Corporation and Certain London Market Insurers,

which was amended on December 7, 1995 ("Settlement Agreement"). The Bankruptcy Judge entered an Order Authorizing and Approving Compromise and Settlement with the London Market Insurers on March 25, 1996.

The Debtor, Dow Corning, and the Tort Claimants' Committee filed an Amended Joint Plan of Reorganization (the "Plan") on February 4, 1999, which was confirmed by an Order dated November 30, 1999. The Plan became effective on June 1, 2004.

The Plan provides that, "[a]ll requests for the payment of administrative expenses pursuant to section 503(b)(1) of the Bankruptcy Code, including applications for the compensation of professionals, shall be filed with the Court no later than 75 days after the Effective Date or at such time as the Court may otherwise order." (Plan, Art. 6.6) The London Market Insurers filed their Application for Allowance and Payment of Administrative Expense Claim on August 13, 2004, amended on June 27, 2007, based on the Reimbursement provision under the Amended December 7, 1995 Settlement Agreement. The Reimbursement provision states,

### VI.D. REIMBURSEMENT RIGHTS

> In the event that the total of the Allocated Expenses, Generic Expenses and Liability Payments attributable to Dow Corning Breast Implant Claims is finally determined to be materially less than the amount actually assumed by the London Market Insurers in connection with their allocation of shares pursuant to this Agreement, the London Market Insurers shall have a right to seek a corresponding reimbursement of a proportion of the Settlement Amount paid by each such London Market Insurer, such reimbursement amount to be determined by the agreement of the Parties and to be paid, with interest, out of the settlement fund. To the extent that portions of the Settlement Amount have been paid out of the settlement fund, the London Market Insurers shall have an allowed administrative priority claim under section 503 of the Bankruptcy Code in the Bankruptcy Case for this reimbursement amount and the interest, after taxes, that has been earned thereon. The Released Subject matter under those Subject Contracts of

3

> Insurance affected by any such reimbursement will be narrowed
> accordingly. Should the Parties fail to agree upon a reimbursement
> amount and the adjustment in the Released Subject Matter, the
> Parties shall invoke the dispute resolution procedures set forth in
> Section VI.B., above.

(Settlement Agreement, ¶ VI..D.).

The London Market Insurers' first Motion for Partial Summary Judgment argues that there is no issue of genuine material fact that the amount the London Market Insurers "actually assumed" under the Reimbursement provision was $5 billion. In the second Motion for Partial Summary Judgment, the London Market Insurers seek to preclude a proposed reinsurance set-off defense by Dow Corning. The third Motion for Partial Summary Judgment also seeks to preclude Dow Corning's defense that the Reimbursement provision is unenforceable. Each motion is addressed in turn below.

## III.    SUMMARY JUDGMENT MOTION STANDARD

Rule 56(c) of the Rules of Civil Procedures provides that summary judgment should be entered only where "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

4

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.   MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING "ACTUAL ASSUMED" LANGUAGE

### A.   Discovery

The London Market Insurers argue that the only pertinent evidence on the factual issue of the amount which the London Market Insurers "actually assumed" could only come from the London Market Insurers and that all evidence demonstrates that the amount "actually assumed was $5 billion." The London Market Insurers submitted the market reports before the Settlement Agreement was executed on October 27, 1995 showing that the allocation of shares was based on an assumed loss of $5 billion. The August 24, 1995 report, dated two days after Dow Corning tendered the final settlement offer, explained that Dow Corning's "figures now were based on a $5 billion ... total potential ground-up loss." ("Actual Assumed" Motion, Ex. F) The September 25, 1995 report, explained that the allocation assumed $332 million in "losses paid to date" plus $4.7 billion in "projected outstanding losses," for a total of approximately $5 billion. ("Actual Assumed" Motion, Ex. H) The October 19, 1995 report, sent shortly before the London Market Insurers executed the Agreement, explained that the allocation of shares "assume[d] that Dow's total ground

5

up liability would be $5 billion." ("Actual Assumed" Motion, Ex. I)

The London Market Insurers also submitted declarations claiming that there are internal documents that reported to the London Market Insurers on the allocation of shares pursuant to the Settlement Agreement, and they uniformly refer to the $5 billion figure. ("Actual Assumed Motion, Exs. A and C)  The London Market Insurers claim that there are no market reports or other internal documents suggesting that any other loss amount, other than $5 billion, was "actually assumed."

The London Market Insurers submitted evidence that shows their counsel informed Dow Corning's counsel that the settlement and allocation of shares assumed a $5 billion loss. The letter to Dow Corning dated September 29, 1995, sent a few days before Dow Corning executed the Settlement Agreement on October 3, 1995, referenced the $5 billion figure.  ("Actual Assumed Motion, Ex. P)

The declaration of Laura White of Peterson Consulting concerning the allocation of shares under the settlement was submitted by the London Market Insurers.  Ms. White stated that the computer program used to perform the allocation required that she enter a single figure for the assumption of the total loss and the amount she entered was $5 billion, as instructed by the London Market Insurers' counsel. ("Actual Assumed" Motion, Ex. B, ¶ 5)

The London Market Insurers submitted declarations by the leaders who represented the London Market Insurers in the settlement negotiations.  Derrick Heath, employed by BD Cooke & Partners on behalf of Dominion Insurance Company, stated that on September 5, 1995, he signed a form, on behalf of Dominion, indicating that he had reviewed the August 24, 1995 report approving the proposed settlement based on the assumption that Dow Corning's ground-up loss would be $5 billion.  ("Actual Assumed" Motion, Ex. C, ¶ 8)  James Teff of the London Market

Claims Service, Ltd., stated that he led the Specialist Claims Unit at Lloyd's of London from 1994 to 1996. The Specialist Claims Unit acted on behalf of Lloyd's in resolving various claims. As to the allocation of shares under the settlement agreement with Dow Corning, Mr. Teff stated that the allocation was based on the assumption that Dow Corning's total breast implant loss would total $5 billion. ("Actual Assumed" Motion, Ex. D, ¶ 3) John Clarke, the Claims Director of Atropos Management Services Limited, stated that in its capacity as run-off agent for St. Katherine Insurance Company, Atropos agreed to the allocation of shares under the settlement agreement based on the assumption that Dow Corning's total breast implant loss would total $5 billion. ("Actual Assumed" Motion, Ex. E, ¶ 3)

The London Market Insurers argue that there is overwhelming evidence to support their claim that the amount "actually assumed" by the London Market Insurers under the agreement was $5 billion. They argue that Dow Corning is unable to submit evidence to create a genuine issue of material fact as to the amount "actually assumed" and that Dow Corning has failed to produce any such evidence in discovery, notwithstanding that it was served long ago with a document request seeking "all documents related to the amount of ground-up loss actually assumed by the parties in connection with the settlement" and an interrogatory asking Dow Corning to state the basis of Dow Corning's contention that the London Market Insurers did not assume a ground up loss of $5 billion. The London Market Insurers urge the Court to enter partial summary judgment in their favor on the "actual assumed" term in the Settlement Agreement.

Dow Corning responds that it has yet to engage in any discovery regarding what amount the London Market Insurers "actually assumed" under the Settlement Agreement. Dow Corning claims that because the London Market Insurers have refused to provide discovery on this issue, Dow

Corning had to file motions to compel discovery that are relevant to the issues raised by the London Market Insurers. Dow Corning notes that the evidence on which the London Market Insurers rely is comprised of declarations by five witnesses who have not been deposed and excerpts from seven documents which are subject to a pending motion to compel. Dow Corning argues that the London Market Insurers' motion should be denied to allow Dow Corning to depose the individuals noted above who submitted declarations supporting the London Market Insurers' motion. Dow Corning submitted a declaration explaining how the pending motions to compel seek information that is directly relevant to the issue underlying the London Market Insurers' motion. ("Actual Assumed" Response, Ex. 1, ¶¶ 7-19)

Even without the benefit of an adequate discovery record, Dow Corning claims it has raised genuine issues of material fact concerning two key aspects of the motion. The first aspect is that the London Market Insurers' motion is based on what Dow Corning claims as the unstated and incorrect assumption that the "actually assumed" clause refers to $5 billion because that pre-discounted figure was inputted into the London Market Insurers' computerized allocation model at the time of the Agreement. Dow Corning claims that the drafters of the Agreement, including Scott Gilbert on behalf of Dow Corning, rejected any reference to the $5 billion in the clause which shows that the clause should be construed to refer to a liability projection that the London Market Insurers "actually" believed and not to an arbitrarily inflated figure plugged into a computer model. Dow Corning states that the London Market Insurers assume the phrase "actually assumed" refers to the "loss input" figure they used in their computerized allocation model, even if that number was subject to heavy discounting and even if it was not a figure they "actually assumed" as a fair reflection of Dow Corning's ultimate breast implant liabilities. Dow Corning argues that the London Market

Insurers' $5 billion figure is unreasonable because it would give them unfettered discretion to use a high input number, knowing that they can discount it back down to a $228 million output figure. Dow Corning claims that either the $3 billion or the $5 billion figure would yield a final gross settlement number of $228 million, depending on the discounted amount. Accordingly, Dow Corning argues that an interpretation which automatically allows the London Market Insurers to base its reimbursement claim on the $5 billion figure only, as opposed to the $3 billion figure, makes no sense.

Dow Corning states that the evidence adduced to date shows that the clause meant the amount the London Market Insurers "actually assumed" in 1995 as to Dow Corning's ultimate breast implant liabilities. Dow Corning claims the term was not intended to mean the pre-discounted number plugged into an allocation model. The drafting history evidence demonstrates that Dow Corning did not agree that the London Market Insurers should be able to seek reimbursement in the event that Dow Corning's total loss for breast implant claims was less than $5 billion. ("Actually Assumed" Response, Ex. 3, ¶¶ 4-6; Exs. 18-19) Dow Corning rejected the attempt to include a $5 billion amount in the reimbursement provision. ("Actually Assumed" Response, Ex. 1, ¶ 5; Ex. 18)

The second aspect Dow Corning disputes is that the London Market Insurers themselves did not "actually assume" the $5 billion amount. Dow Corning claims the London Market Insurers rely heavily on a brief excerpt form Mr. Gilbert's deposition to support their position that they assumed the $5 billion amount. The London Market Insurers, Dow Corning argues, ignored Mr. Gilbert's testimony that the London Market Insurers believed that the $3 billion assumption was "artificially high" and that the $5 billion assumption was "ridiculously high." ("Actually Assumed" Response, Ex. 6, at 119) Dow Corning further claims that even the Bankruptcy Judge presiding over the

9

evidentiary hearing in 1995 and 1996 as to the amount used by the parties, found the record unclear on that point.  *In re Dow Corning Corp.,* 198 B.R. 214, 223 n. 8 (E.D. Mich. Bankr. 1996) (Noted that the $3 billion was the estimate originally used for the negotiations but found it was "not clear from the record" whether negotiations after August 1995 used the $5 billion figure.)  Dow Corning claims that the negotiating history shows the settlement amount was not reached based on a single allocation run that assumed $5 billion in total costs, that the parties considered various ranges of allocations, with $3 billion receiving the most emphasis as the parties closed in on a final settlement amount.  ("Actually Assumed" Response, Ex. 2, ¶ 11)  Dow Corning claims that the evidence shows the parties were close to a deal when the focus was $3 billion but before Dow Corning indicated it needed to be able to justify a deal to the tort creditors with a $5 billion "worst case benchmark." ("Actually Assumed" Response, Ex. 5; Ex. 2, ¶ 15)  Dow Corning also submitted evidence showing that a number of $3 billion allocations were exchanged between the parties and considered in connection with the Settlement Agreement up until the time it was finalized.  ("Actually Assumed" Response, Exs. 9, 16, 21, 22)

If the Court only considered the evidence submitted by the London Market Insurers regarding the "actually assumed" phrase in the Reimbursement provision, summary judgment would be entered in their favor.  However, under Rule 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The general rule is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *Vance v. United States,* 90 F.3d 1145, 1148 (6th Cir. 1996).  The very purpose of discovery is to

flesh out facts that are necessary to support or refute a party's claim. It would be improper to expect a party to be able to withstand the test of proofs required of a motion for summary judgment, without the benefit of discovery. The plain language of Rule 56(c) mandates entry of summary judgment, "after adequate time for discovery." *Celotex,* 477 U.S. at 322. Courts[1] have a general policy that motions for summary judgment will not be considered until after the close of discovery. *Ramik v. Darling Int'l, Inc.,* 161 F.Supp.2d 772, 776 n. 1 (E.D. Mich. 2001).

The Court denies the London Market Insurers' Motion for Partial Summary Judgment on the Amount "Actually Assumed" term given that the London Market Insurers have not produced all the documents requested by Dow Corning relating to this issue. Dow Corning has not deposed the individuals who submitted declarations in support of the London Market Insurers' motion. Dow Corning must be allowed to test the London Market Insurers' evidence given that the term at issue is material to the claim brought by the London Market Insurers.

Dow Corning has submitted sufficient evidence, at this stage of the matter, to create genuine issues of material fact as to whether or not the parties' intent as to the "actually assumed" term was the $5 billion amount, rather than a $3 billion amount. Dow Corning submitted evidence to show that the parties discussed both numbers in its negotiations and the Bankruptcy Court found the amount was not clear on the record when it approved the Settlement Agreement. The London Market Insurers' Motion for Partial Judgment on the "Actually Assumed" language is denied.

---

[1] The Eastern District of Michigan recently amended its Local Rules allowing only one motion for summary judgment to be filed by a party to prevent a party from filing several summary judgment motions challenging one claim per motion. E.D. Mich. LR 7.1(b)(2).

**B.  Extrinsic Evidence**

The London Market Insurers argue that the term "actually assumed" is unambiguous and there is no need to submit extrinsic evidence to determine the parties' intent regarding this term. Dow Corning claims that extrinsic evidence is admissible "to show the existence of an ambiguity and to demonstrate the parties' actual intent," citing *Midwest Healthplan, Inc. v. Nat'l Med. Health Sys., Inc.,* 413 F. Supp. 2d 823, 827-28 (E.D. Mich. 2005).

In Michigan, "[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 492 (1998).  The Michigan Supreme Court has distinguished between a *patent* ambiguity, which appears on the face of a document, and a *latent* ambiguity, which is not readily apparent from the language of a contract, "but instead arises from a collateral matter when the document's terms are applied or executed."  *City of Grosse Pointe Park v. Michigan Muni Liability & Prop. Pool,* 472 Mich. 188, 198 (2005).  "Because the detection of a latent ambiguity requires consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist."  *Id.*  "In other words, where a latent ambiguity exists in a contract, extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract." *Id.*; *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 575 (1964).  Even when contractual language appears clear and intelligible and suggests but a single meaning on its face, extrinsic or parol evidence may be used to show a latent ambiguity and therefore create "a necessity for interpretation."  *In re Kramek Estate,* 268 Mich. App. 565, 574-75 (2005).

In order for the Court to properly interpret the Reimbursement provision, the Court must determine the meaning of the phrase, "amount actually assumed by the London Market Insurers in connection with their allocation of shares pursuant to this Agreement." (Reimbursement provision) Whatever the amount is, such amount must be actually assumed by the London Market Insurers. This phrase creates a latent ambiguity because extrinsic evidence is required to properly interpret the phrase. The amount is not set forth in the provision. The parties could have easily added a figure to make the phrase unambiguous. Dow Corning has shown that it rejected the $5 billion amount in the provision during the drafting process. Dow Corning's rejection of the amount in the provision creates a genuine issue of material fact that the term "actually assumed" was $5 billion, as argued by the London Market Insurers. It could be either $5 billion or $3 billion. Both numbers appear in the London Market Insurers' evidence submitted as exhibit P, the September 29, 1995 letter to Mr. Gilbert from the London Market Insurers' counsel. The phrase also requires that the amount must be "actually assumed" by the London Market Insurers–does this mean just the leaders, or the leaders and some followers or all followers? The amount actually assumed is tied to the phrase "in connection with their allocation of shares." Does this mean the amount need not be the amount or amounts Dow Corning submitted to the London Market Insurers but that the London Market Insurers was required to independently analyze an amount depending on their allocation of shares? It may very well be that after sifting through the discovery from both sides, the parties will be able to better aid the Court in interpreting the terms of the Reimbursement provision. The Court denies the London Market Insurers' Motion for Partial Summary Judgment on the "Actually Assumed" phrase set forth in the Reimbursement provision.

## V. MOTION FOR PARTIAL SUMMARY JUDGMENT TO PRECLUDE PROPOSED REINSURANCE SET-OFF DEFENSE

The London Market Insurers move for partial summary judgment to preclude Dow Corning's purported reinsurance set-off defense. Under Dow Corning's set-off theory, the London Market Insurers claim they are not entitled to the full amount of reimbursement contractually due to them under the Settlement Agreement but must instead reduce the amount by any reinsurance the insurers collected. The London Market Insurers claim the well-established rule is to the contrary, citing a leading treatise on insurance law which states, "'[t]he fact that a surety company [an insurer] has reinsured itself does not prevent it from prosecuting an action, to the right of which it has been subrogated, in its own name for the full amount of its subrogated rights ...' Lee R. Russ, *Couch on Insurance 3d* § 222:17 (1995 & Supp. 1998)." ("Set-Off Defense Motion," p. 7) "Put simply," as the London Market Insurers state, an insurer is entitled to sue for the full amount it is owed, even where it has obtained reinsurance to protect its interests. "How the insurer and reinsurer divide up the amount recovered by the insurer not only is between the insurer and reinsurer–two commercially-sophisticated parties perfectly capable of determining how to allocate the amount of recovery–but it is completely irrelevant as to how much the insured (here, Dow Corning) is obligated to repay." ("Set-Off Defense Motion," pp. 7-8) The London Market Insurers also argue that the Reimbursement Clause does not provide for a set-off and must be enforced as written. The London Market Insurers further argue that allowing Dow Corning a set-off defense would nullify its obligation under the settlement agreement to pay the refund due. It was London Market Insurers who paid for the reinsurance premiums and if allowed a set-off defense, Dow Corning would benefit from the reinsurance for which the London Market Insurers paid for. The London Market Insurers argue that Dow Corning would receive a windfall if it were allowed a set-off defense.

14

Dow Corning responds that summary judgment cannot be entered in favor of the London Market Insurers because their position is legally flawed and their interpretation of the parties' contract is disputed. Dow Corning argues that under Michigan law, the collateral source rule does not apply to a breach of contract case, citing *Corl v. Huron Castings, Inc.,* 450 Mich. 620, 544 N.W.2d 278 (1996). Dow Corning further argues that in a breach of contract claim, any recovery by the prevailing party must be reduced by any compensation received from another source.

Dow Corning claims that the single passage cited by the London Market Insurers from a treatise to support their position is inapplicable. ("Set-Off Defense Motion," p. 7) The cited passage refers to "subrogated rights" which is not an issue in this case. The matter at issue, as argued by the London Market Insurers, is a contract action with no claim to subrogation rights.

Dow Corning notes that the matter is before the Court on the London Market Insurers' administrative claim application pursuant to Section 503(b) of the Bankruptcy Code. Dow Corning argues that a bankruptcy court routinely disallows claims to the extent that they would result in a double recovery, citing *In re Lenz,* 80 B.R. 528, 529-30 (Bankr. D. Colo. 1987) (Denying a claim by a creditor as double recovery, noting that in bankruptcy, the goal is to compensate each creditor as much as possible for its losses and yet give the debtor a fresh start) and *Browning v. Levy,* 284 F.3d 761, 778 (6th Cir. 2002) (Any recovery that claimant might have received on its claims from third parties would reduce its claims against the bankruptcy estate). Dow Corning claims that Section 503(b) of the Bankruptcy Code is a provision that permits administrative expense claims for "*actual* expenses." 11 U.S.C. § 503(b)(italics added). Dow Corning argues that because the London Market Insurers have recovered from their reinsurers certain portions of the reimbursement amount they seek from Dow Corning, their "actual" expense is limited by the amount recovered from their

15

reinsurers.

Dow Corning claims that the Settlement Agreement does not contain an express provision which precludes consideration of reinsurance recoveries in evaluating a reimbursement claim. Accordingly, Dow Corning argues that the Settlement Agreement does not bar limiting any recovery by the London Market Insurers and considering reinsurance payments from the amount sought in the administrative claim.

The London Market Insurers seek a ruling that Dow Corning may not assert any "set-off" defense against any recovery they may receive on their administrative claim before the Court. Specifically, the London Market Insurers do not wish to reduce any recovery from this Court of any payments they received from their reinsurers.

By way of background, generally, "reinsurance" comes in two basic types, assumption reinsurance and indemnity reinsurance. An assumption reinsurance is where "the reinsurer steps into the shoes of the ceding company with respect to the reinsured policy, assuming all its liabilities and its responsibility to maintain required reserves against potential claims. The assumption reinsurer thereafter receives all premiums directly and becomes directly liable to the holders of the policies it has reinsured." *Colonial American Life Ins. Co. v. C.I.R.,* 491 U.S. 244, 247 (1989). In indemnity reinsurance, "it is the ceding company that remains directly liable to its policyholders, and that continues to pay claims and collect premiums. The indemnity reinsurer assumes no direct liability to the policyholders. Instead, it agrees to indemnify, or reimburse, the ceding company for a specified percentage of the claims and expenses attributable to the risks that have been reinsured, and the ceding company turns over to it a like percentage of the premiums generated by the insurance of those risks." *Id.* An agreement between the ceding company and the reinsurer is a

16

contract between the companies only; "the policyholders are not involved and usually remain unaware that part or all of the risk has been reinsured." *U.S. v. Consumer Life Ins. Co.,* 430 U.S. 725, 730 (1977). Although the London Market Insurers have yet to specifically indicate which type of reinsurance agreement is at issue, based on the papers filed by the parties to date, it appears that the indemnity reinsurer agreements are at issue.

Here, the London Market Insurers essentially seek to apply the collateral source rule to this contract matter. In Michigan, the collateral source rule is a concept of tort law which provides "that the recovery of damages from a tortfeasor is not reduced by the plaintiff's receipt of money in compensation for his injuries from other sources." *Tebo v. Havlik,* 418 Mich. 350 (1984); *Corl,* 450 Mich. 620, 544 N.W.2d at 280. The Michigan Supreme Court held that "[t]he collateral source rule does not apply in cases of common-law contract." *Corl,* 544 N.W.2d at 286. The Michigan Supreme Court elected to distinguish between tort and contract remedies, noting that in the commercial contract situation, "unlike the tort and marriage contract actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith." *Id.,* 544 N.W.2d at 282 n. 17 (citation omitted). The goal in contract law is not to punish the breaching party, but to make the nonbreaching party whole. *Id.,* 544 N.W.2d at 281.

The Michigan Supreme Court in Michigan has made clear that the collateral source rule does not apply to damages in contract cases. In this case, if the London Market Insurers' reinsurers have paid a certain amount under the reinsurer agreements then that amount must be taken into consideration in this proceeding in order to determine what amount will make the London Market Insurers whole. The language in the Russ treatise cited by the London Market Insurers, "'[t]he fact

that a surety company [an insurer] has reinsured itself does not prevent it from prosecuting an action, to the right of which it has been subrogated, in its own name for the full amount of its subrogated rights ...'" is distinguishable because the quoted portion of the treatise applies to subrogated rights, which is not at issue in this case. ("Set-Off Defense Motion," p. 7) The quoted language does not address the issue of remedy or damages. It merely states that a subrogee can assume the rights of a subrogor when prosecuting a case. Based on Michigan law, the collateral source rule does not apply to claims based on contracts, such as this case. The Court will not apply the collateral source rule in this case.

The London Market Insurers argue that the contract should be enforced as written and, because no "set-off" language is found in the agreement, Dow Corning should not be allowed to assert a "set-off" defense. As the parties have argued, this matter is a contract claim under the Reimbursement provision in the parties' Settlement Agreement. There is no express "set-off" language in the Reimbursement provision. Where a contract is silent on a term, "silence does not equal ambiguity if the law provides a rule to be applied in the absence of a provision to the contrary." *Norman v. Norman,* 201 Mich. App. 182, 184 (1993). Given that Michigan law provides that in a contract action, the goal is to make a nonbreaching party whole and that the collateral source rule does not apply in contract actions, the absence of an express "set-off" language is not ambiguous and does not mean that the law does not allow consideration of other sources in fashioning a remedy in favor of the London Market Insurers. "Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing." *Morris v. Clawson Tank Co.,* 459 Mich. 256, 263 (1998). "Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are

reasonable under the circumstances to avoid or minimize the damages." *Shiffer v. Bd. of Ed. of Gibraltar School Dist.,* 393 Mich. 190, 197 (1974)(quotation omitted). The injured party should not obtain a windfall; that is, he should not be placed in a better position as a result of any breach. *Goodwin, Inc. v. Orsen E. Coe Pontiac, Inc.,* 62 Mich. App. 405, 413 (1975). Any mitigation or savings to the injured party should be deducted from any award. *Id.*

The same reasoning applies to the London Market Insurers' argument that to allow Dow Corning to assert a "set-off" defense would nullify Dow Corning's obligation under the settlement agreement to pay the refund due and that Dow Corning would benefit from the reinsurance for which the London Market Insurers paid. Given that contract law in Michigan allows consideration of other sources in order to determine damages in a contract claim, a "set-off" defense does not nullify any obligation Dow Corning may have under the agreement. As to the argument that Dow Corning may benefit if a set-off is allowed, the Court assumes that London Market Insurers paid the appropriate premium to their reinsurers for the purpose of insuring themselves from the risks they took in providing insurance to Dow Corning. Dow Corning does not benefit from the reinsurance for which the London Market Insurers paid, as argued by the London Market Insurers. Dow Corning paid the appropriate premiums to the London Market Insurers for the liability coverage under the insurance contract. The reinsurance provision was not a term under the insurance agreements but a provision of the settlement agreement between the parties.

It is noted that this matter is before the Court on an administrative expense application filed by the London Market Insurers under 11 U.S.C. § 503(b). Administrative expense claims may be allowed for the "actual necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1). "The purpose of this Code section is to encourage third parties to provide the debtor in

19

possession with goods and services essential to rehabilitation of the business." *In re Economy Lodging Systems, Inc.,* 243 B.R. 691, 697 (B.A.P. 6th Cir. 1999). "Claims for administrative expenses under § 503(b) are strictly construed because priority claims reduce the funds available for creditors and other claimants." *In re Federated Dept. Stores, Inc.,* 270 F.3d 994, 1000 (6th Cir. 2001). The bankruptcy court has "broad discretion to determine whether a claim for an administrative expense is, actually, an administrative expense." *In re Moore,* 109 B.R. 777, 780 (Bankr. E.D. Tenn. 1989). The bankruptcy court exercises its discretion to determine whether to allow administrative expenses and the appropriate amount to award. *In re Alumni Hotel Corp.,* 203 B.R. 624, 630 (Bankr. E.D. Mich. 1996).

Given that the Court has broad discretion to determine whether to allow an administrative expense and the amount of an award, the Court must have before it all the necessary facts to make such a determination, including any other sources which would make the London Market Insurers whole. For the reasons set forth above, the London Market Insurers' Motion for Partial Summary Judgment to Preclude Proposed Reinsurance Set-Off Defense is denied.

## VI. MOTION FOR PARTIAL SUMMARY JUDGMENT TO PRECLUDE DOW CORNING'S DEFENSE THAT THE REIMBURSEMENT PROVISION IS UNENFORCEABLE

In this motion, the London Market Insurers move for an order precluding Dow Corning from asserting its "Third Separate" Defense that the reimbursement provision of the Settlement Agreement is invalid or unenforceable. Dow Corning responds that it is not seeking to dismiss the claim based on unenforceability. Specifically, Dow Corning submitted a supplemental interrogatory answer confirming that "the Settlement Agreement constitutes valid and binding obligations of the

20

Debtor and its Estate, which shall be enforceable in accordance with the terms thereof."

("Unenforceable" Motion, Ex. 3, at 2) Dow Corning, after the London Market Insurers filed the

instant motion, sent a letter to their counsel stating,

> To be clear, Dow Corning is not asserting as a defense that the Settlement Agreement or any of its provisions are invalid or facially unenforceable; rather, we are asserting that LMI Claimants' claim is not based on a proper *application* of the provisions of the Settlement Agreement, and therefore is not enforceable as LMI Claimants seek to apply it. Dow Corning agrees that the Settlement Agreement, including the reimbursement provision, is fully enforceable in accordance with its terms.

("Unenforceable" Motion Response, Ex. E)

The London Market Insurers claim that this is now a "new position" Dow Corning is

asserting. They indicated in a letter to Dow Corning that they are seeking to strike Dow Corning's

Third Separate Defense and any potential arguments that the Settlement Agreement or any of its

provisions were invalid and unenforceable "with prejudice." ("Unenforceable" Motion Response,

Ex. F)

The Court finds Dow Corning is not asserting a defense that the Settlement Agreement or

any of its provisions are invalid or facially unenforceable. However, Dow Corning is not precluded

from arguing, and neither is the London Market Insurers, that the interpretation or application of

some of its provisions, should not be applied as argued by a party in a particular manner. As the

Court has seen so far, the London Market Insurers are able to argue how a certain provision should

be interpreted by the Court. The Court will not preclude Dow Corning from arguing to the contrary

or to assert an interpretation it believes should be applied to the provisions at issue. The London

Market Insurers' Motion to Preclude Dow Corning's Defense that the Reimbursement Provision is

21

Unenforceable is granted in part and denied in part as set forth above.

**VII.    CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that the London Market Insurers' Motion for Partial Summary Judgment Regarding "Actual Assumed" Language (7/31/08; #29941) is DENIED.

IT IS FURTHER ORDERED that Dow Corning's Motion to File Surreply Brief (10/3/08; #29960) is GRANTED given that the London Market Insurers were able to submit a response.

IT IS FURTHER ORDERED that the London Market Insurers' Motion for Partial Summary Judgment to Preclude Proposed Reinsurance Set-Off Defense (10/24/08; #29965) is DENIED.

IT IS FURTHER ORDERED that the London Market Insurers' Motion for Partial Summary Judgment to Preclude Dow Corning's Defense that the Reimbursement is Unenforceable (3/27/09; #29996) is GRANTED IN PART and DENIED IN PART, as more fully set forth above.


   _/s/ Denise Page Hood_
DENISE PAGE HOOD
U.S. District Judge

DATED:  June 9, 2010